Securities and Exchange Commission v. Rogas Good morning, and may it please the Court. My name is Ann Voights, and I represent Mr. Rogas in his appeal and Pillsbury Winthrop in theirs. I'd like to discuss the two issues that are on appeal. First, whether Mr. Rogas, who is a first-time offender who accepted responsibility for his acts, should have incurred a lifetime bar. And second, whether a payment made, as is the default under New York law as an advanced payment retainer, can nonetheless be clawed back based on an asset freeze order entered after the payment was made. The answer to both questions should be no, and this Court should reverse the district court's orders on both points. If I could address the bar first. With respect to the bar, as everyone acknowledges here, the point of these bars are not to punish a particular individual, but to protect the public. And what the district court did here that was flawed was, in assessing the Patel factors, it essentially collapsed two factors into one by deeming that Mr. Rogas was effectively, or at least technically, while not a repeat offender in the second circuit law, he treated him as such. And that resulted in a lifetime bar for someone who was a first-time offender, who had accepted responsibility, and who had no other history in this case that would warrant such a severe imposition. Well, I mean, the Court twice stated that your client wasn't a repeat offender. Is it – is he not supposed to consider that there were repeated acts of fraud over an extended period of time? He's certainly allowed to consider that under the egregiousness of the factor, the first of the Patel factors. But by – I think the repeated reference to him as technically not a repeat offender made it clear that the Court also viewed that as cutting against Mr. Rogas in this case. How so? If he's acknowledging that he's not a repeat offender, we're supposed to think that that's code for thinking he was the equivalent of a repeat offender? I think so here. And particularly if you look at the cases that the Court relied on to justify it, those are very different from the facts that we have here. Those cases involve individuals who ignored preexisting preliminary injunctions or bars. They involve much more egregious behavior. In one case, in the Drexel Burnham case, they in fact violated two separate injunctions. Or in the Shkreli case, where again, there was just a vastly different pattern of conduct. And so even if this Court disagrees with how we think the Court viewed the question of repeat offender, we still think evaluating all of the factors in this case, it was an abuse of discretion to find that a lifetime bar was appropriate. Because the egregiousness factor, the recurrent and systemic nature factor, the degree of scienter factor, and the age factor all cited by the District Court won't support what? Don't support a lifetime bar. Because as Patel said, when you're looking at this, when you're dealing with someone who is a first-time offender, the presumption is that you would not impose a lifetime bar. And so you need to articulate a basis that would justify that. And we don't think that was done here. If I could turn to the second issue. The second issue, I think, also raises a question of how the District Court approached it. This involved, under New York law, what is by default an advance payment retainer that was made. It was made before any asset freeze order was entered. The record reflects that it was understood that this was being billed against, that this was being . . . I'm sorry, I didn't catch the last thing that you just said. The record reflects that as of, certainly starting in November 2020, DOJ was aware that this retainer had been made. It was billed where it was clear from the beginning that they were billing against it. And then even when it comes to the question of what was understood about it, even in 2023 when DOJ submitted the Marshall's affidavit, they recognized that these assets were a substitute asset. So they didn't take the position, even in 2023, that these came directly from tainted funds. And so I think to ask . . . Your adversary's briefing said that in November 2020, when the U.S. Attorney's Office told the firm that the source of the funds was fraud, that there was a request then to segregate them and not to spend them down. Am I misunderstanding the record? So that is reflected in a letter written in 2024 by DOJ. That is different from our understanding and what we think the record reflects. So that's an area of dispute. What is clear is that after that, it reflects that we indicated that we had spent a certain amount. There are questions, how much have you spent at this point? How much have you billed? So there certainly was an understanding that Pillsbury was continuing to bill. And I think when it turns to the question of what we knew, the SEC is asking this Court to impose a rule that would require us to have perfect hindsight. And that is not something that is appropriate here. Based on what we knew at the time that the payment was made, we knew that Mr. Rogas was a successful businessman. We knew that the funds came from a separate company that was not named in the asset freeze order that came later. And based on that, we had every reason to think that these funds were ones that we could take. We took them as part of an advanced payment retainer. And the Court made a mistake in concluding that all of it should be clawed back. Well, the question is whether or not Mr. Rogas had an interest in the money, even after it was transferred to Pillsbury, right? Correct. Because if he did, then it does get clawed back. And there the question becomes, what was the arrangement between the firm and the defendant with respect to this money? And I gather there's some question here as to whether Pillsbury understood that if it didn't bill that full amount, it was going to have to return the money, or did I misunderstand things? That is correct, but that is not inconsistent with New York law, which holds that the advanced payment retainer is the firm's property. If at some point not all of it is exhausted, they do have to return that portion, but that is a very hypothetical interest. And we think the ethics laws are clear, because if it is not the firm's property, you could not put it into the operating account as Pillsbury properly did. You would have to put it in an escrow account, which is not what happened here. And I see, if I may reserve the balance of my time for rebuttal. There was a retainer agreement here that provided for the modest incremental payments, and then there's this deposited. And am I right, there's nothing in the record that indicates the terms and understandings on which this money was accepted, that Pillsbury didn't put anything in writing about that, or did I miss it? So what is in the record is there was the initial engagement letter. Is there anything with respect to the party's understanding with respect to this payment of the large amount? Yes. They're the declarations of both Mr. Rogas and the declarations of Mr. Sullivan, both of which are after the fact. I'm talking about a contemporaneous document saying this is being paid. It becomes your money. If we don't bill against it, we get back. I mean, there's no document for the turnover of this rather sizable amount of money. There is the original engagement letter, which, yes, agreed to $15,000, but the language of that, both the language about replenishing is consistent with an advanced payment retainer. But the original agreement only provides for further monies to be deposited as the original money is used up, right? And that language, as courts outside of New York have held, is consistent with an advanced payment retainer. And you're saying that now covers the fees? We do. Can I just ask, so the original payment, the original payment letter refers to $15,000. The $4 million is received after, and I think there's no dispute about this, after Pillsbury has basically advised Mr. Rogas that he's likely to face serious investigation, both criminal and an SEC complaint. So the money comes in. Then the civil enforcement action is filed, I think, just a couple of days later. And then the temporary freeze order is placed on the public docket on September 18th. And that freezes over $35 million, and it warns attorneys, agents, everybody, you shouldn't move these funds, you should hold them. I mean, regardless of the fee arrangement here, doesn't New York law, whether it's a security retainer or an advanced payment retainer, doesn't New York law say you would pay down money at your peril in circumstances like that, or am I misunderstanding the New York law? I don't think so, Your Honor. I think if the court looks at the cases that we've cited, both inside New York and out, it becomes the property of the law firm. And in this case, it became the property of the law firm before the asset freeze was entered. And Pillsbury had no reason to suspect the origin of the funds was tainted. And so they acted properly in that circumstance, and the district court erred in ordering that all of it be turned over. I'm having trouble understanding New York law in this area. Please help me out. You're saying it becomes the property of the law firm, but anything they don't bill against has to be returned. That doesn't seem to me be any different from a normal retainer agreement, that where it doesn't become your property, it just is placed there and you can draw against it. We do recognize this is a somewhat unique artifact of New York law in particular, but New York law is very clear about that. It is very clear that an advanced payment retainer, you, A, have an ethical obligation to return what is not spent, but at the same time, it is very much the property of the law firm. Otherwise, then, as they've held, you could not put it into your operating account, and it's, in fact, improper to put it in an escrow account. Why is this protection for? What's the purpose of distinguishing between these two forms of payment? New York has made it very clear it's in order to protect the ability to pay for counsel against creditors. But an escrow account would do that as well. Not, I think, in the same way, because the question is, and this again goes to whether the asset freeze order would cover it or not, the asset freeze applied to the property of Mr. Wobus. It did not apply to the property of anyone else other than the entities that were named. And so in this case, to extend that freeze beyond its plain terms, to apply to a fee that was paid under New York law as a default as an advanced payment retainer was an error on the district court's part. If I may, I'll reserve the balance of what little time I have. Good morning, Your Honors. And may it please the Court, Paul Alper, as for the Securities and Exchange Commission. Your Honors, I'd like to begin by addressing a couple of the things that my friend on the other side has said. First, she stated that the asset freeze doesn't cover, it only covers property of Mr. Wobus and doesn't cover property owned by anyone else. They spend a lot of time in their brief talking about the issue of ownership, who owns the property, and setting aside the fact that these are fraud proceeds, money obtained by fraud. So I don't want to get into the fact that, you know, whether they were actually Mr. Wobus's to begin with. But the issue of whether Mr. Wobus or Pillsbury owns the money is irrelevant to whether the asset freeze covers them, because as the district court reasonably found, the language of the asset freeze unambiguously covers not only assets of Mr. Wobus, but assets held by third parties, including his attorneys, for Mr. Wobus's benefit. And Pillsbury repeatedly has acknowledged that those funds were being used to secure Mr. Wobus's legal defense and thus conferring a benefit to Mr. Wobus. So this court need not reach the issue of what type of retainer agreement was entered into between Mr. Wobus and Pillsbury, although we think the evidence shows, the record shows, that it was a security retainer because the asset freeze covers them whether Pillsbury owned the funds or Mr. Wobus owned the funds. And even still, under New York law, both federal cases, state cases, and New York State Bar Association opinions uniformly have held that there is a distinction between a flat fee advanced payment retainer and a retainer that is used as a security for future legal services. And in those cases, the latter cases in which this case falls within, while the law firm owns the assets, technically, the client retains a sufficient ownership interest in any unbilled funds. And there were $3.61 million in unbilled funds at the time of the asset freeze. Mr. Wobus's interest in those funds at the time, if Mr. Wobus had called up Pillsbury on the day of the asset freeze and said, I don't want you to represent me anymore, I'm done. Pillsbury was required under law, and they acknowledge this, to give that money back. So the idea is that even though, let's assume for a moment that it was an advanced payment retainer and that somehow it's Pillsbury's money, it's not required to be held in escrow, it goes into their operating fund, but it can still be held for the benefit of Mr. Wobus, and that's evidenced by the fact that their legal obligations would be, if he doesn't use all of it, they're going to return it, and they likely might be returning some part of it, and thus falls within the language of the asset freeze. That's exactly right. I mean, if you look at the retainer agreement, the letter of engagement, that expressly states that the funds were being used to secure Pillsbury's legal representation, thus conferring a benefit to Mr. Wobus. So those funds were being used for Mr. Wobus's benefit here. So that necessarily falls within, on page 866 of the asset freeze there, is any bank or frontage broker or other person or entity holding any funds for the benefit of Mr. Wobus. So it was certainly within the court's discretion to conclude that those funds fell within the asset freeze, and that result makes sense, right? I mean, the purpose, the undisputed purpose of asset freezes such as this is to preserve the status quo, to give the district court the opportunity to assess what, if any, fraudulent proceeds remain, to prevent the dissipation and further harm to injured investors, so ultimately those funds can be clawed back and be given to the harmed investors. And while the language is broad, each of these asset freezes, and this asset freeze is no exception, provides an ability for third parties such as Pillsbury to come to the court and to make a request for carve-outs. And the carve-out is at A67, and it says that any party may seek leave of this court upon a proper showing. Pillsbury, it is undisputed, did not take advantage of that at all. And in fact, the only time they made a request to the court to effectively carve out the money was after they had already spent all of the money and billed against it completely. Unless the court has any further questions. There was a considerable amount of back and forth between the parties as to, I mean, the U.S. Attorney's Office is aware that Pillsbury has this money. Their exchanges, there's never an effort by the SEC or the U.S. Attorney's Office to say, stop spending this money down, or am I misunderstanding the record? Well, I think if you look at A273, Mr. Linnell's letter to counsel at Pillsbury, he states that in November he informed Pillsbury that the funds were fraudulent proceeds. They're directly traceable to Mr. Rogas' fraud, advised them not to spend down any funds. And according to this letter, Pillsbury represents that it will not do so. So the issue of whether or not, you know, and so that's the U.S. Attorney's position in November 2020 when there was still $3.6 million remaining unbilled. Now, the SEC, for its part, wasn't even made aware of the existence of these funds until two years later when it received a copy of the sworn accounting that Pillsbury filed on Mr. Rogas' behalf in the criminal matter. And in that sworn accounting, and the sworn accounting is at A220 and A222, the, it listed on A220, it lists the $3.61 million as an unsecured, as an unsecured asset that is in escrow, held in escrow for Mr. Rogas' benefit. And then it separately lists at A222 that there are legal fees in the amount of $2 million. But there's no connection between those two. If there was, if the fees had already been billed against that $3.61 million, surely the sworn accounting would have shown it, but it didn't. So even in September 2022, when the SEC first learns of this information, it's not, the information that it receives is not correct. Then in a year later in June 2023, the SEC finally hears that Pillsbury is billing against these funds. And understandably, responds as the criminal authorities did, which is you shouldn't be spending that money. And then we file the motion in the district court. So the government has been consistent. I can see that maybe there wasn't a lot, you know, they weren't talking as much as they could. But I think the government's position has been consistent throughout that they were not entitled to spend this money because they were fraud proceeds. And on the issue, you know, that just of the funds, Pillsbury has not shown either, as our brief makes clear, that they have satisfied either element. They did not provide value for the funds. A bona fide recipient is measured at the time value is provided. A promise to perform legal fees in the future is not value. And Pillsbury, by the fact that the funds remained unbilled as of the asset freeze, had not provided value for the funds in September of 2020. There were still $3.61 million in unbilled funds at that point. And on the issue of whether they had notice, of course they had notice. A273 states that they had notice in November 2020, when there were still $3.6 million left. And every penny that they billed against after that point was done with the notice that those funds were directly traceable to Mr. Rogas' fraud. Briefly, on the issue of the O&D bar, the district court reasonably exercised its discretion in fashioning such relief. As Your Honors have noted, all of the Patel factors, barring the repeat offender element, strongly favor a permanent bar. Patel states clearly that there is no requirement that a defendant be found to be a repeat offender, which the district court, as you rightly point out, Your Honor, the district court twice stated he was not a repeat makes findings that there is a likelihood of recurrence. It is okay to impose a permanent bar. And critically, the findings that the district court made in concluding that a permanent bar was appropriate are not challenged here. And that's a really important point to consider. You know, so these are, you know, I appreciate that Pillsbury and Mr. Rogas would, you know, have argued that there maybe should have been a different weighting of the factors, but the underlying findings that the district court made are unchallenged. And so it certainly was well within the court's broad discretion in fashioning such relief. Unless the court has any further questions? Thank you very much, Your Honors. Thank you, Your Honor. If I could just address a few brief points my friend made. First, with respect to the idea that Pillsbury was on notice from the beginning, I'd point to what the Department of meaning not directly traceable. And what they said in their filing, which is at DOJ docket 90, paragraph 6, they said, quote, the United States has not been able to locate, obtain, or collect any assets traceable to the proceeds of the defendant's offenses, despite the exercise of due diligence in investigating the assets of the defendant. Well, they didn't know that the $4 million had been transferred to you, isn't that right? They did know. They listed it as a substitute asset. Oh, later on, yes. Yes, in 2023. But you had noticed, didn't you, as soon as you got notice of the freeze? No, we did not. The payment came from a different company. He had, this was a first time allegation of criminal behavior on his part. He had significant other assets. Why wasn't the asset freeze noticed to you? Because if that were the case, then in every, I think that would apply with tremendous consequences for any criminal defendant. Well, it tells you that the court has frozen any assets being held for his benefit. Now, isn't that what you were holding? No, I think the meaning of being held for his benefit refers to something that he had a claim over, and he didn't. It's stretching it to say that that would encompass here payment for services that were rendered. It's undisputed that Pillsbury did represent them for you. And you didn't go to the court to clarify that, holding $4 million. And with the benefit of hindsight, if this could have avoided this, certainly. But having said that, so did SEC and DOJ. They were certainly aware of this. This was discussed from very early on. And certainly SEC, the SEC did. For example, if you look, they went back in 2022 and asked the court to amend the freeze to identify a Caribbean property of Mr. Rogas, to make it clear that it was covered by freeze. Despite years of notice, they didn't do that here. We think the district court's decision has sweeping and negative consequences for criminal defense. We think it's inappropriate here, and we ask this court to reverse. Thank you very much. Thank you both. Well argued. We'll take the matter under advisement.